SMITH *v.* GIBBS.

44  335
68  217

The sale of the good will of a business will take from the seller the right to continue, or in any way hold himself out as continuing the identical business, the good will of which he has sold ; but it will not necessarily prevent him from engaging in a similar business, which is not in fact and does not purport to be a continuation of that of which he has sold the good will.

Where the defendant had sold a newspaper published by him in D., and its subscription list, and also a printing establishment, carried on there by him in connection with the newspaper, "with the good will belonging and appertaining to the same" ;— *Held*, that this sale did not deprive him of the right to establish in D. a new

and different newspaper, and in connection therewith a new printing office, where such new printing office and newspaper were not in fact, and did not purport to be a continuation of the printing establishment or newspaper sold, and where the business of the new office and journal was not in fact, and did not purport to be, a continuation of the business, the good will of which the defendant had sold.

The plaintiffs having bought from the defendant an established buisness, with the good-will belonging to it, and received a bill of sale thereof, brought a bill in equity against the vendor to restrain him from carrying on a similar business; — *Held,* that parol evidence was inadmissible to vary the written contract of sale, by showing that at the time of the sale, or during the negotiations therefor, the vendor made a verbal agreement that he would not set up a competing business.

Where, by written articles between the plaintiffs and the defendant, the former agreed to purchase and the latter to sell a certain newspaper and printing establishment, with the good-will belonging thereto, for a sum to be fixed by the appraisal of A, B and C; and A, B and C, by virtue of this agreement, and without any further authority, made the appraisal upon the supposition that the defendant was to be excluded from any competing business; and thereupon the sum fixed by them was paid by the plaintiffs to the defendant, who gave to the plaintiffs a bill of sale of the newspaper and printing establishment, with the good-will belonging thereto; and it did not appear that the defendant knew that the appraisal was made upon such a supposition; — *Held,* that the defendant was not estopped to assert a right on his part to set up a competing business.

A usage, to be admissible to explain the intent of parties in a contract, must be so well settled, so uniformly acted upon, and of such long continuance, as to raise a fair presumption that it was known to both contracting parties, and that they contracted in reference to and conformity with it.

In Equity. The bill set forth that on the 27th day of July, 1858, and for more than thirty years before, the defendant, John T. Gibbs, was and had been the proprietor of the Dover Gazette printing establishment, in Dover, and the editor and proprietor of the newspaper called the "Dover Gazette and Strafford Advertiser;" that the Dover Gazette printing establishment had a large and valuable patronage in the county of Strafford, and chiefly in Dover; that the Dover Gazette and Strafford Advertiser was a political newspaper, advocating the principles of the political organization known as the democratic party, with a subscription list of 2,500 subscribers or more, but depending for support mainly upon a limited local and political patronage, chiefly in the counties of Strafford and Carroll; that the printing establishment and newspaper were intimately connected, and to a great extent dependent each upon the other.

The bill set out certain written agreements made between the plaintiffs, Joseph H. Smith and another, and the defendant, on the 27th and 29th days of July, 1858, an award in writing by the appraisers, made on the 29th day of July, 1858, and a bill of sale of the printing establishment, newspaper subscription list, with the good-will belonging to the same, executed by the defendant to the plaintiffs on the 6th day of August, 1858. The agreements, award and bill of sale sufficiently appear in the opinion of the court. The bill alleged that upon the delivery of the bill of sale the plaintiffs paid to the defendant $4,800 as the consideration of the sale and transfer, and the agreement of the defendant thereafter set forth; that the plaintiffs took possession, and have carried on the printing business, and have weekly issued the newspaper, and continued it of the same political character, and have therein advocated the

principles of the political organization known as the democratic party, from the 6th day of August, 1858, to the time of filing the bill; and that they desire and purpose to continue in said printing business, and to issue said newspaper, and to receive and enjoy the benefit, profit and advantage of said subscription list, and the good-will of said establishment; that it was agreed between the plaintiffs and the defendant, and was a part of the agreement for said purchase and sale, and was so understood by the appraisers in making their appraisement, that the defendant was fully and completely to relinquish and give up to the plaintiffs the newspaper and printing business, as then existing and before carried on by him; and that the defendant was not to set up or engage in the printing and newspaper business in rivalry or competition with the printing establishment and newspaper sold as aforesaid, either in Dover, the county of Strafford, or the territorial limits included within the circulation of the newspaper so sold; and that he was in no way to hinder, interrupt, or interfere with the full, free and uninterrupted use, enjoyment, profit and advantage of the premises, so sold and conveyed in the bill of sale, and as appraised by the appraisers. The bill further alleged that, according to the custom of the trade and business of printing establishments, and of carrying on and publishing political and local newspapers of the character of the printing establishment and newspaper aforesaid, it is understood, in the sale and purchase of such establishment and newspaper, with the subscription list and good-will, that the seller shall retire from the business, and shall not directly or indirectly establish and carry on a printing establishment or newspaper in the same place, so that such new printing establishment and newspaper shall be in rivalry or competition with the printing establishment and newspaper sold; that said subscription list and good-will made more than one half of the $4,800, as considered and appraised by the appraisers; that the principal value of the newspaper and establishment depended upon the defendant withdrawing from and giving up said newspaper and printing business, and the good faith in which he kept and carried out his aforesaid agreement; that the great inducement to the plaintiffs to purchase was the aforesaid agreement of the defendant, and that without it they would not have made the purchase; that the expenses of maintaining said establishment were large, and somewhat fixed, and subject to comparatively little variation by the increase or decrease of patronage; that two similar newspapers and printing establishments located in Dover could not receive adequate patronage and support; that the plaintiffs have on their part fully and faithfully executed said agreement; that the defendant and divers other persons, &c., under the firm of J. T. Gibbs & Co., on the first day of April, 1860, issued a prospectus of a new paper, to be published by said firm; that on the first day of May, 1860, the defendant set up in Dover a printing establishment of the character of the Dover Gazette printing establishment, as carried on by the defendant before and by the plaintiffs since said sale, and on said day issued a newspaper called the Dover Sentinel, of the same dress and general appearance of the Dover Gazette,

&c., as formerly issued by the defendant, and claiming to be of the same political character, and to advocate the principles of the political organization known as the democratic party; that the defendant has continued to issue said newspaper and to carry on said printing establishment, and has received a large amount of profits therefrom; that on the first day of April, 1860, and frequently since, the defendant has solicited the patronage of his old friends, and has, unsolicited, sent the Sentinel to many of them, and invited them to subscribe for the same; that he has personally urged the subscribers of the Dover Gazette, &c., to discontinue that paper and subscribe for the Sentinel, and that he has offered to subscribers of the Gazette, who had paid in advance, to send them the Sentinel free for the time they had thus paid in advance, if they would discontinue the Gazette and subscribe for the Sentinel; that the support of the two printing establishments and of the two papers depends and must depend upon the patronage and circulation in the same district of country, and upon the same class of people; that the new establishment and new paper are in direct competition and rivalry with the old printing establishment and the old paper, and materially interfere with their patronage and profits, injure their business, and greatly diminish their value. The bill also alleged that on the first day of January, 1859, the defendant borrowed of the plaintiffs the original subscription list of the Dover Gazette, as sold by him to the plaintiffs, and has since retained the same, and refused to deliver the same to the plaintiffs, although frequently requested so to do. The bill prayed for an account of all the receipts and charges of the defendant for work done in the printing establishment, so set up by him, and for subscriptions to the Dover Sentinel, and for and on account of the business so set up by the defendant; and for a decree that the defendant pay over the same, when ascertained, to the plaintiffs; and that the defendant deliver up the subscription list to the plaintiffs; and that he be enjoined from exercising and carrying on the said printing business, and from issuing and circulating the Dover Sentinel, or any other paper in rivalry or competition with the business or paper so sold by him, within the county of Strafford, and from permitting any other person or persons to carry on the same business for him, or on his account, within the county of Strafford, and from selling and disposing of, or leasing and letting his presses, type, and other materials, to any other person or persons for the purpose of carrying on the same or like business within the county of Strafford, and from doing any other act in violation of and inconsistent with said agreement with the plaintiffs; and for general relief.

The answer alleged that whatever agreements were made between the plaintiffs and the defendant, relative to the matters stated in the bill, were reduced to writing, and signed and sealed by the parties, except an agreement that the defendant should let to the plaintiffs his printing rooms, and an agreement in relation to certain advertisements in the Gazette. It set forth the alleged agreement as to the rooms, and made certain allegations in reference to it, which it

is unnecessary to state. The answer denied that the plaintiffs had in their newspaper advocated the principles of the political organization known as the democratic party, and averred that they had in said newspaper opposed and denounced the national democratic administration. It denied any agreement by which the defendant was excluded from engaging in any rival or competing business, or that it was so understood by the appraisers; and also the existence of any such custom of the trade as was set up in the bill. It did not admit that the subscription list and good-will made more than one half of the $4,800, &c., or that the principal value of the Gazette and printing establishment depended upon the defendant withdrawing from and giving up said newspaper and printing business; or that two similar newspapers and printing establishments located in Dover could not receive adequate patronage and support. It averred that the defendant and one Mellows entered into a copartnership under the firm of J. T. Gibbs & Co., on the first day of May, 1860, in carrying on the printing business; and that previous to forming said copartnership the defendant informed said Mellows that he was under no obligation to the plaintiffs not to publish a newspaper or engage in the printing business in Dover; and that from the first day of May until the 26th day of October, 1860, said firm published weekly a family and democratic political newspaper, called the Dover Sentinel, in many respects in its dress and appearance unlike the Dover Gazette, &c., as formerly issued by the defendant; and that the Sentinel has ever defended and supported the national democratic administration. It further alleged that on the 26th day of October, 1860, the defendant sold all his interest in the establishment to Mellows and others, and was then employed by them as one of the editors of the Sentinel. The answer admitted that the defendant had received pay and profits from the business set up by him, and averred that the advertising done by the plaintiffs was and had been more than was done by the defendant, while he published the Gazette. It denied that the defendant had urged the subscribers to the Gazette to discontinue that paper, or that he had offered to any such subscribers to send them the Sentinel free, as was alleged in the bill; but admitted that in a few instances, where some subscribers of the Gazette who were friends of the defendant, and had paid in advance, had expressed a dislike to that paper, and a desire to take the Sentinel, but were unwilling to pay for two papers at once, he may have sent to a few such the Sentinel free until the time for which they had paid in advance expired. The answer denied that the support of the two papers had depended or must depend upon the same class of people, while the Gazette should be managed in the style and manner in which it had been managed since August, 1858; and it did not admit that the Sentinel and its printing establishment were in direct competition and rivalry with the old printing establishment and the old newspaper, and materially interfered with their patronage and profits, injured their business, and greatly diminished their value; and it denied that the defendant had ever retained and refused to deliver to the plaintiffs the original subscription list of the Gazette,

but alleged that the same had been at divers times in the possession of the plaintiffs, and always, whenever asked for by the plaintiffs, and then was ready for delivery to them. The answer further stated that when the attorney for the plaintiffs was drawing the bill of sale he proposed to introduce therein this clause: "And the said Gibbs, for the consideration aforesaid, does hereby agree that he will do nothing to injure the said Smith & Foster in the business aforesaid, or to interrupt or in any way damnify them in the full and free use, exercise and enjoyment of all and every thing hereby conveyed;" that the defendant refused to allow the same to be inserted in said bill of sale, and declared to said attorney that he did not sell himself or any of his rights, and that he only sold the printing materials, and that he wanted a paper to correspond with the written agreements, signed and sealed by the plaintiffs and defendant, which agreements he then exhibited to said attorney. The answer craved leave to refer to said agreements and to the bill of sale.

The cause was heard upon the bill, answer, and evidence.

*Perley* (with whom were *Wheeler & Hall*), for the plaintiffs.

I. The defendant was bound, by the written instruments in the case, not to set up another newspaper and printing establishment to interfere with that which he sold to the plaintiffs.

(1) The writings bind the defendant to this without any recourse to explanatory evidence. By his deed the defendant conveyed to the plaintiffs what had been appraised by the arbitrators, to wit, "the printing establishment, with the presses, type, material, subscription list and good-will belonging and appertaining to the same, as appraised by William Butterfield, William H. Huse and Samuel C. Baldwin, as by their award dated July 30, 1858." To ascertain the subject matter of the contract and sale we must go back to the award and submission. All the writings on the subject, being thus referred to in the deed for a description of the premises sold, must be taken together, as parts of one transaction and contract, and the intention and effect of the contract gathered from a consideration of the whole.

The term good-will sometimes means simply the advantage which the sole ownership of property gives the purchaser beyond its actual value; and the good-will, in that sense, passes, of course, by a mere sale of the property, without any mention of their good-will. In another sense, the term good-will implies a stipulation, on the part of the seller that he will not carry on the same business, so as to conflict with that to which the property sold has been devoted. *Harrison* v. *Gardner*, 2 Madd. 198; *Kennedy* v. *Lee*, 3 Meriv. 451, 452, 453; Story on Part., sec. 99; Coll. on Part., secs. 161, 162. The good-will here conveyed is the good-will as appraised by the arbitrators; that is to say, the good-will in the sense in which it was appraised and understood by them. The award and submission clearly show that it was understood and appraised by the arbitrators in the sense which excluded the defendant from carrying on the

same business, so as to interfere with the newspaper and establishment which were appraised and sold.

(2) Parol evidence is admissible to show the character and situation of the subject matter of the contract, and when that is shown the court will, in this case, infer that it must have been the understanding of the parties, and true intent of the written instruments, that Gibbs should be excluded from setting up a rival paper and establishment. Lindley on Part. 707, 708; 4 C. & H., Phill. Ev. 512, 504, 495; 2 Phill. Ev. 731; *Storer* v. *Freeman*, 6 Mass. 435. The term good-will has not a uniform, definite, legal meaning. In such, and indeed in all cases, evidence of the situation, nature and circumstances of the subject matter of any writing may be shown, to ascertain the true construction. 1 Greenl. Ev., secs. 286, 287, 288.

(3) Butterfield, Baldwin, Huse and McFarland are owners and publishers of newspapers like the Dover Gazette; they have had a large experience in the purchase and sale of newspaper establishments, and their uncontradicted testimony shows that whatever may be the meaning of the terms used in these instruments, as applied to other kinds of property, the sale of a newspaper, subscription list and good-will implies a stipulation that the seller shall not engage in the same business to the injury of the purchaser. 1 Greenl. Ev., sec. 280.

(4) The defendant sold not only the material property and good-will of the establishment, but the subscription list. This, of course, does not mean the mere paper writing which contains the names of the subscribers. What, then, does it mean? It is a term peculiar in this sense to the publication of periodicals, and evidence is clearly competent to show its meaning, if evidence were necessary; and the evidence shows that, in the understanding of newspaper publishers, the sale of the subscription list implies that the seller will not set up a newspaper that shall interfere with the paper to which the subscription list belonged. The sale of the subscription list would be idle and illusory if the seller might immediately apply to his old patrons to transfer their names to a new paper.

(5) According to the defendant's construction the contract is silent as to the exclusion of the defendant from any rival business, and it would be no contradiction of the written contract to show a verbal agreement by the defendant not to engage in any rival business; and the parol evidence shows a binding contract by the defendant that he would not set up a rival paper in Dover. *Blanding* v. *Sargent*, 33 N. H. 239.

II. Under the names of the subscription list and good-will of the establishment, the appraisers appraised the right to exclude Gibbs from setting up a rival newspaper and printing establishment. This right they valued at half the whole sum set on the establishment. This sum the plaintiffs paid the defendant; the plaintiffs, therefore, have paid for the right to exclude the defendant from setting up another paper; and whether the writings contain any stipulation against it or not, it is fraudulent and dishonest in the defendant to take from the plaintiffs what he has sold and they have bought and paid for. If neither the deed nor any other writing had made any

mention of the good-will or the subscription list, still, if the exclusive right had been appraised and paid for, the defendant could not set up a competing business. *Harrison* v. *Gardner*, 2 Madd. 198; *Kennedy* v. *Lee*, 3 Meriv. 451, 452; Story on Part., sec. 211; Lindley on Part. 707; Coll. on Part., sec. 348; 14 Sumn. Ves. 468, note; *Cruttwell* v. *Lye*, 17 Ves. 341.

III. The evidence shows the paper started by the defendant to be seriously and directly injurious to the newspaper and establishment of the plaintiffs.

IV. The defendant is liable for the injury caused by the newspaper and establishment after his sale to Mellows and others, on the same principle that the owner of land, who sells it with a nuisance on it, is liable for damage caused after the sale. *Plumer* v. *Harper*, 3 N. H. 88.

V. The plaintiffs may have a remedy in equity and by injunction. *Buxton* v. *Jenness*, 8 L. & E. 155; *Lumley* v. *Wagner*, 13 L. & E. 25; *Turner* v. *Evans*, 21 L. & E. 598; *Bryson* v. *Whitehouse*, 1 S. & S. 14; *Williams* v. *Williams*, 2 Swanst. 253; *Butler* v. *Burleston*, 16 Vt. 176; *Clark* v. *Clark*, 26 Barb. 76; *Forina* v. *Silverlocke*, 39 L. & E. 514; 2 Story Eq., secs. 926, 932.

*Christie, Woodman, Wiggins* and *Heard*, for the defendant, cited Adams Eq. 28; 1 Greenl. Ev., secs. 275, 282; *Putnam* v. *Morrison*, 2 Brown Ch. 219; *Rich* v. *Jackson*, 4 Brown Ch. 516; *Jordan* v. *Sawkins*, 3 Brown Ch. 389; *Brodie* v. *St. Paul*, 1 Ves. 333; *Hare* v. *Shearwood*, 1 Ves. 242; *Irnhan* v. *Child*, 1 Brown Ch. 92; *Jackson* v. *Cator*, 5 Ves. 688; *Woodlan* v. *Hearn*, 7 Ves. 211; *Steele* v. *Kinkley*, 3 Ala. 352; *Evans* v. *Bicknell*, 6 Ves. 183; *Parkin* v. *Theovald*, 11 L. & E. 278; 2 C. & H. Phill. Ev. 275, 282; 3 Kent 72; *Cruttwell* v. *Lye*, 17 Ves. 346; *Holden* v. *McMahin*, 1 Green Sel. C. 299; *Baynham* v. *Guy Hospital*, 3 Ves. 295; *Eaton* v. *Lyon*, 3 Ves. 694; *Bell* v. *Locke*, 8 Paige 75; *Churton* v. *Douglass*, H. R. 5 Johns. 174; Lindley on Part. 707, 708; *Rannie* v. *Irving*, 7 M. & G. 969; *Farr* v. *Pierce*, 3 Madd. 74; Smith Mer. L. 202; Coll. on Part., secs. 161, 162; *Palmer* v. *Graham*, 1 Parsons Sel. C. 146; Gow on Part. 428; *Crawshay* v. *Collins*, 15 Ves. 227; *Chissum* v. *Dewes*, 5 Russ. 29; Stark. on Part. 351; *Dougherty* v. *Van Nostrand*, Hoffm. 69; *Hogg* v. *Kirby*, 8 Ves. 225; *Shackle* v. *Baker*, 14 Ves. 469; 2 Phill. Ev. 343; *Spicer* v. *Lea*, 3 East 311; *George* v. *Bartlett*, 22 N. H. 496; *Macomber* v. *Parker*, 13 Pick. 175; *Eaton* v. *Smith*, 20 Pick. 156; *Hart* v. *Albany*, 3 Paige 213; *Trustees* v. *Gwathmay*, 1 A. K. Marsh. 554; *Brown* v. *Brown*, 8 Met. 576; *Attorney-General* v. *Clapham*, 31 L. & E. 142; *Smith* v. *Wilson*, 3 B. & Ad. 728; *Leidman* v. *Schultz*, 24 L. & E. 305; 1 Greenl. Ev., secs. 275, 296; *Hunt* v. *Rousmanier*, 8 Wheat. 174; 2 Lead. Cas. in Eq. 659; *Bigelow* v. *Collamore*, 5 Cush. 417; *Parkhurst* v. *Cortland*, 1 Johns. Ch. 274; *Crozier* v. *Acer*, 7 Paige 137; 1 Spence Eq. 557; Eden on Inj. 223; *Snowden* v. *Noah*, Hopk. 347; Adams Eq. 81; *Baxter* v. *Connolly*, 1 J. & W. 576; *Bozon* v. *Forlow*, 1 Mer. 460; *Hamlin* v. *Denneford*, 2 Edw. 529; *Barrett* v. *Blagrave*, 5 Ves. 555; *Adderly* v. *Dixon*, 1 S. & S. 608; *Morris* v. *Coleman*, 18 Ves. 437; *Clark* v. *Price*, 2 Wils. 157;

*De Rivafinoli* v. *Rosetti,* 4 Paige 264; *Kemble* v. *Kean,* 6 Sim. 333; *Kimberly* v. *Jennings,* 6 Sim. 340; *Tyson* v. *Watts,* 1 Md. Ch. 13; *Brown* v. *Cahill,* 4 McLean 19; *Duval* v. *Myers,* 2 Md. Ch. 401; *Stoaterburgh* v. *Tomkins,* 1 Stockt. 302.

BARTLETT, J.* In some of the books there is an apparent confusion in the use of the term "good-will." It is said to bear two significations; first, the "advantage arising from the mere fact of sole ownership of the premises, stock, or establishment, without reference to other persons as rivals;" and second, the "advantage arising from the fact of excluding the retiring partner from the same trade or business as a rival." Story Part., sec. 99. But we think there is no good ground for such a distinction in law. Indeed, it seems hardly consistent with the definition given by *Story* in the first part of the section cited. He says, "good-will may be properly enough described to be the advantage or benefit which is acquired by an establishment, beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from accidental circumstances or necessities, or even from ancient partialities or prejudices. Thus an inn, a nursery of trees and shrubs, a fashionable stand, or a newspaper establishment may, and often does enjoy a reputation and command a price beyond the intrinsic value of the property invested therein, from the custom which it has obtained and secured for a long time; and this is commonly called the good-will of the establishment." If good-will is merely the advantage from the sole ownership of property, it adds nothing in a legal view to such ownership, and is ordinarily meaningless in conveyances. Cases may be conceived where the good-will of a business is of no practical value, unless accompanied by the ownership or possession of certain property, and where the ownership or possession of such property might enable a party in effect to enjoy all the substantial benefits of the good-will; as where the good-will of the public to the business is due solely to certain qualities or characteristics peculiar to the property employed in it, or to the special advantages of a particular locality. In such instances the attraction for the public patronage may be entirely in the particular property or locality, and the possessor of such property or locality may have the exclusive possession of all the means of attracting patronage, that belonged to the business. The vendor of such property has not sold the good-will of his business, though he may have parted with all that in fact gave value to that good-will. He has still in law the right to carry on his own business, for he did not give up that by his contract, but he may have disabled himself in fact from exercising that right, and from enjoying the popularity his business had attained, because he has ceased to possess the particular property which was essential to the business and

* DOE, J., did not sit.

its popularity. So in a legal view the purchaser has not acquired the good-will of the seller's business; he has obtained no legal right to exclude the latter from carrying it on as before; but, as the particular property was essential to the business or its patronage, he may have gained the exclusive power to conduct the business or to secure the patronage. If in such case the seller could find other means to carry on his old business and secure the old custom, there would be nothing to prevent him in the mere fact that he had sold the property which he had formerly used in that business. If A, the owner of a printing establishment, sells the premises and all the material used by him in the business, and nothing more, the purchaser has the sole ownership and the exclusive possession of the property, but he has not the good-will of the business established by A, and it can not be doubted that the latter, so far as this sale is concerned, has the right to continue his old business at the next door; and by his old business we mean not merely a business of the same kind, but the identical business. But if B has established a business in selling the products of his vineyard, and obtained a large patronage for it solely because of the peculiar qualities of a kind of grapes that will grow there and not elsewhere, and he sells the vineyard, he has not sold the good-will of his business, for there is nothing to distinguish this case legally from that just supposed, but he has in fact parted with all that rendered the good-will valuable, and lost the power of continuing his old business, but not the right. These examples show that there may be a variety in the circumstances upon which the good-will and its value are dependent, but they do not establish any diversities in the legal nature of good-will.

In *Kennedy* v. *Lee*, 3 Meriv. 451, Lord *Eldon* said that " where two persons are jointly interested in trade, and one, by purchase, becomes sole owner of the partnership property, the very circumstance of sole ownership gives him an advantage beyond the actual value of the property, and which may be pointed out as a distinct benefit essentially connected with the sole ownership. In the case of the trade of a nurseryman, for instance, the mere knowledge of the fact that he is the sole owner of the property and in the sole and exclusive management of the concern, gives him an advantage which the other partner, supposing him to carry on the same trade with other property, not the partnership property, would not possess. In that sense, therefore, the good-will of a trade follows from and is connected with the fact of sole ownership." The business in question in *Kennedy* v. *Lee* was that of nurserymen, and from what has already been said it is apparent that the remarks of Lord *Eldon* may have been correct when applied to that case. However, they probably were not intended as a general legal definition of " good-will," the case calling for no construction of that term, and they can not be received as such. He adds, " there is another way in which the good-will of a trade may be rendered still more valuable; as by certain stipulations entered into between the parties at the time of the one relinquishing his share in the business; as by inserting a condition that the withdrawing partner shall not

carry on the same trade any longer, or that he shall not carry it on within a certain distance of the place where the partnership trade was carried on, and where the continuing partner is to carry it on upon his own sole and separate account.   Here the Lord Chancellor had in mind the exclusion of the retiring partner from a rival business, and he speaks of it not as a consequence of the transfer of the good-will, but as the result of some additional contract.

In *Cruttwell* v. *Lye*, 17 Ves. 346, Lord *Eldon* says : " The good-will, which has been the subject of sale, is nothing more than the probability that the old customers will resort to the old place." The same or similar language has been used in other cases.   *Harrison* v. *Gardner*, 3 Mad. 455 ; *Chissum* v. *Dewes*, 5 Russ. 29.   This remark of Lord *Eldon* may be generally correct in certain cases, where the good-will is dependent for its value solely upon locality, but it would be too narrow a construction of an expression made in reference to particular instances, to regard it as a general definition.   *Churton* v. *Douglass*, 1 H. R. V. Johns. 174.   There are kinds of business in which the good-will is substantially independent of any precise locality, and where it may be valuable not only from the likelihood of retaining old custom, but also because of the probability of attracting new by its established reputation, or other acquired advantages.   An established business often obtains a value beyond the actual amount of tangible property employed, from the ability with which it has been conducted, the reputation it has attained, the advantageous site it has secured, or other circumstances which have gained it popularity, or given it the power of attracting patronage.   The owner of such a business obviously may have great advantages over one who sets up a new business of the same kind, in competition with the old and well known establishment. The intention of the parties to a sale of such an establishment with its good-will is to transfer those advantages to the purchaser.   It is the object of the contract to place him, so far as may be, in possession of the business with these advantages, so that he may continue it as the seller might have done.   The seller has parted with his right to this established business, and may not lawfully continue it, while the purchaser has acquired that right.   By the sale, every thing transferable, necessary to effect such a result, passes.   The contract does not include the popularity and personal qualities of the seller, which are not transferable, but the good-will they have gained for the business.   It has never been understood that such a sale binds the seller to exercise his ability or industry for the purchaser ; for he has merely sold the business with the advantages, which they with other circumstances have established ; and we think such a contract does not restrain him from their general exercise.   The policy of the common law would not justify any unnecessary implication of such restraint ; and we think the somewhat indefinite character and practical limits of an exclusion from competing business would not recommend it to any special favor.   Before the sale the vendor had no immunity from competition, though in some cases he has been protected from rivals who fraudulently held themselves out as conducting the business he had established.   *Bell*

v. *Locke*, 8 Paige 75; *Hogg* v. *Kirby*, 8 Ves. 215; 2 Story Eq., sec. 951; Coll. on Part. (3 Am. ed.), sec. 162, note. This protection is given not to exclude honest competition, but merely to secure the tradesman against wrongful interference in the advantages he has acquired for his business. If it be the object of a sale of the good-will to place the purchaser, so far as may be, in possession of the advantages the seller has acquired for his establishment, then the exclusion of any fair competition is not a necessary incident, for that was not one of those advantages. As such a sale does not include the general popularity, abilities or exertions of the seller, but, so far as these are concerned, only the advantages they have gained for the established business, we think the purchaser may enjoy all the latter without the exclusion of the seller from the kind of business. The vendor sells only the good-will of the particular business, and not his right to engage in business; he parts with the established business, but not with his right to set up a new one. He can not carry on the identical business he has sold, for he has relinquished all his right to that by the sale; but so long as he does not continue or attempt to carry on that, there is nothing to prevent him from establishing a new and similar business, since there is no necessary legal limitation as to its kind. His exclusion from the kind of business might make the good-will sold more valuable, and so perhaps might his continuing to exert his ability for the benefit of the purchaser, but neither are necessarily involved in the contract, and the purchaser desiring such advantages must secure them by special contract. *Kennedy* v. *Lee*, 3 Mer. 452.

By the sale of the good-will of an established business we understand that the seller parts with and the purchaser acquires the right to continue that established business, with all the advantages belonging to it as such. This, as we understand it, is the view of the Vice-Chancellor in *Churton* v. *Douglass.* He says, "good-will, we apprehend, must mean every advantage — every positive advantage, if I may so express it, as contrasted with the negative advantage of the late partner not carrying on the business himself — that has been acquired by the old firm in carrying on its business whether connected with the premises in which the business was previously carried on, or with the name of the late firm, or with any other matter carrying with it the benefit of the business." The sale of the good-will of a business will take from the seller the right to continue, or in any way hold himself out as continuing the identical business, the good-will of which he has sold, but will not necessarily prevent him from engaging in a similar business, that is not and does not purport to be a continuation of the old one. *Churton* v. *Douglass, Cruttwell* v. *Lye, Shackle* v. *Baker* (14 Ves. 468), *Harrison* v. *Gardner, Kennedy* v. *Lee;* Lindley on Part. 705, *et seq.; Snowdon* v. *Noah* (Hopk. 533). Possibly cases may arise where the questions, what is a continuance of the old business, and when a party is to be considered holding himself out as continuing it, may prove difficult, but perhaps the difficulty will quite as often be found one of fact, arising from the nature of the business, or the circumstances on which its good-will is founded, as of law.

The plaintiffs claim that the defendant has no right to set up a
rival newspaper, because of his sale to them of the subscription
list of the Dover Gazette.   The original agreement between the
parties was in writing, and provided, among other things, for the
sale of "all the presses, type, printing materials, papers of every
kind, and all the property now owned by said Gibbs and belonging
to the Dover Gazette printing establishment," in &c., at the ap-
praisal of A., B. and C., which was to be "final as to the value of
said printing establishment."   By a subsequent additional contract
in writing, the parties agreed that the appraisers should, at the time
they appraised the property before mentioned, "also appraise the
present value of the subscription list of the Dover Gazette, and also
the good-will of the Dover Gazette printing establishment."   These
contracts made provision that if either party should refuse to carry
out the agreement, such party should pay to the party ready and.
willing to comply with the same, $1,000, "the same to be regarded
as settled and liquidated damages."   A further written agreement
provided that the defendant should pay to the plaintiffs all money
received by him "for advance subscriptions at the time" of the
transfer of said printing establishment, and also for the fulfillment
of existing contracts for advertising, the proceeds of which were to
be apportioned in a specified manner.   The appraisers, by their
written report, after stating that they had "examined all the property
referred to in the agreement, and duly considered the whole matter,
and heard the parties," award "that said printing establishment,
with the presses, type, materials, property, subscription list and
good-will belonging and appertaining to the same, is of the value of
$4,800."   The defendant, by his bill of sale, in consideration of
$4,800, sells and conveys to the plaintiffs "the printing establish-
ment, with the presses, type, materials, property, subscription list
and good-will belonging and appertaining to the same, as appraised
by" A., B. and C., ".as by their award dated," &c., "a copy of which
is in the possession of each of the parties" to the bill of sale; and
he adds, "meaning hereby to transfer and confer all of the right
and interest I have in the Dover Gazette printing establishment, as
existing and heretofore carried on by me."   This establishment
seems to have included the publication of a newspaper called the
Dover Gazette, and a job printing office.

If we assume, as the plaintiffs claim, that it was the intention of
the parties in their contract that the sale should be of the whole
establishment, including the newspaper, with its good-will; that is,
of all the material property, with the right to continue the news-
paper, and the printing office, with all the advantages that popularity,
reputation, or other circumstances had given them; still we see no
good reason to hold that the special mention of the subscription
list among the other property sold excludes the defendant from the
right to publish a new and different newspaper.   We understand
the subscription list to be a catalogue of the subscribers to the
newspaper, with their residences.   It in fact contains a list of exist-
ing customers for the journal, and in providing for an appraisal of
its existing value the parties seem to have intended in substance an

appraisal of the value of the right to furnish this newspaper to these customers, or perhaps to these and all others desiring it, and a transfer of the subscription list in this case would seem to pass to the plaintiffs not only the material list, but also such a right so far as it was transferable by the defendant. But the right thus transferred is not to supply these subscribers or others with all newspapers, or any other journal than this, to which alone the subscription list has reference. If in this view the words add nothing to the general terms used, the same is true of other items enumerated in the agreements and bill of sale. The number of subscribers to a newspaper forms so important an element in its value, and in this case the newspaper was so considerable part of the concern, that it does not seem singular that the subscription list was specially mentioned. The plaintiffs' position would give greater effect to the sale of the subscription list, than the law, as we understand it, would allow to a transfer of the newspaper establishment with its good-will. The defendant, however, contends that by the contract the good-will of the job printing office only, and not of the newspaper, passed. Were it allowable to adopt this construction the case would obviously stand no better for the plaintiffs. We think there is nothing in the written contract between the parties that deprives the defendant of the right to establish a new journal different from the Dover Gazette, and in connection with his newspaper a new printing office, which is not a continuation of the old business; for he has only parted with his right to continue the old established business and the old journal.

If these views are correct, the plaintiffs' argument founded upon the two significations which they suppose attach to the term " good-will," must fail. There is no occasion to inquire in which sense the term was used, or to resort to the aid of parol evidence; nor can such evidence be received to show that at the time of the sale, or during the prior negotiations, a verbal agreement was made by the defendant that he would not establish a competing business, if such be the fact; for the contract is not silent upon this point, but contains in effect an agreement by the defendant not to continue the particular business sold to the plaintiffs; and to allow such proof would be to receive parol evidence to change a written agreement not to continue a particular newspaper and a designated printing business into a general contract not to set up any rival newspaper or engage in any competing business. 2 Phill. Ev. 358; 1 Greenl. Ev., sec. 275; Pillsbury v. Locke, 33 N. H. 102; Churton v. Douglass. Of course the declarations alleged to have been made by the defendant since the written agreement was entered into can not be received to vary its effect. Fitts v. Brown, 20 N. H. 398.

The plaintiffs have attempted to show that by the usage among the publishers and conductors of similar journals and printing establishments a sale of the good-will and subscription list takes from the seller the right to establish a competing journal and printing office; but we think their evidence fails to show a usage of that description "so well settled, so uniformly acted upon, and of so long a continuance, as to raise a fair presumption that it was known

to both contracting parties, and that they contracted in reference to and conformity with it." *Foye* v. *Leighton*, 22 N. H. 76. Under these circumstances it is unnecessary to inquire whether the present is one of those cases where usage is to be admitted in construing the contract. See *Wheeler* v. *Nurse*, 20 N. H. 221; *George* v. *Bartlett*, 22 N. H. 498.

The plaintiffs claim that the conduct and declarations of the defendant have been such that it would be against good conscience for him to set up a rival business; in short, that the defendant is equitably estopped to deny an agreement on his part not to set up such a business, by his representations made during the negotiations, and by the facts that the appraisers, with the knowledge of the parties, fixed the value of the good-will upon the supposition that the defendant was excluded from any competing business, and that the plaintiffs made and the defendant received payment for the good-will as thus appraised. This suit is brought not to obtain relief from fraud or mistake in making the writings, and the bill seeks not to set aside the award or the contract, or to reform the latter, but to enforce it; and in this case the "cotemporary or prior parol stipulations between the parties are to be regarded as merged in the written contract;" 2 C. & H. Notes to Phill. Ev. 519; *Nutting* v. *Herbert*, 35 N. H. 126; *Hunt* v. *Rousmanier*, 8 Wheat. 174; they can not be received to vary it, and to allow them in this case the effect by way of estoppel, which the plaintiffs claim, would be a mere evasion of the rule.

Lord *Eldon* says, in *Cruttwell* v. *Lye*, "with regard to conduct, a man might stand by, and give encouragement, generating a confidence that he would not engage in such a trade, inducing other persons to involve themselves; on the ground of which this court might interfere." The sale in question in that case was made by the assignees of a bankrupt, and the suit was brought to restrain the bankrupt from engaging in a similar business. We understand the remark of the chancellor to be but an intimation that the court might in the case supposed apply the ordinary rules of estoppel *in pais*, and we find nothing in it or in the case to indicate that in such application, if made, the settled rules of the law as to parol evidence were to be violated or evaded in any case where the rights of the parties were founded upon their written contracts.

In the present case the agreement for sale did not authorize the appraisers to fix the value of the good-will and subscription list upon the supposition that the defendant was not to have the right to engage in any business of the same kind, or bind the defendant to part with that right, and he did not attempt to do so by his bill of sale. The award itself does not show that the appraisal was made as the plaintiffs claim, and whether in the present case we can look beyond that and receive the evidence of the appraisers to learn what was appraised (see *Furber* v. *Chamberlain*, 29 N. H. 405; *Aldrich* v. *Jessiman*, 8 N. H. 520, and *Harrison* v. *Gardner*), we need not inquire, for the evidence does not show that the defendant knew that the appraisement was thus made, or received payment for surrendering any such right. The papers do not show such an

appraisal; there is no direct evidence of the defendant's knowledge, and it is not to be inferred, from the mere fact that the tangible property may not have been worth the $4,800, if that is to be considered, for the good-will and subscription list were also to be included in the appraisement; nor do we find any fact in the case from which such knowledge is fairly implied; and certainly there is no presumption that the defendant supposed he was including in his contract any such undefined restraint. This view would seem to be confirmed by the evidence that the defendant declined to sign a bill of sale containing this clause, "and the said Gibbs, for the consideration aforesaid, does hereby agree that he will do nothing to injure the said Smith & Foster in the business aforesaid, or to interrupt or hinder, or in any way damnify them in the full and free use, exercise and enjoyment of all and every thing hereby conveyed;" and of the manner in which he thus declined, if evidence of what took place, in the absence of the plaintiffs, between the defendant and the attorney employed by the parties to draft the bill of sale, can be considered. If the defendant did not know that any such exclusion entered into the appraisal or sale, he can not be estopped by his acceptance of the $4,800, however it might have been if he had been so informed, for the estoppel is claimed solely upon the ground that it would be a fraud in the defendant, having knowingly received payment for the relinquishment of certain rights, now to assert them. He had the right to receive for the property mentioned in the agreement its value, as fixed by the appraisal, and as the case stands we must take it that he received the $4,800 supposing that sum to be the value thus fixed, and nothing more; and thereupon made a conveyance of that property as he had agreed, and nothing farther. Here is no act or conduct of the defendant inconsistent with the right he now sets up, or that would make it a fraud on his part to assert such right. *Pickard* v. *Sears*, 6 A. & E. 460; 2 Smith L. C. 531, *et seq.* Beside, it would seem that the plaintiffs can hardly claim that they were misled by the defendant's conduct. The agreement showed exactly what was to be appraised and sold, and it did not include any relinquishment on the part of the defendant of his right to set up a new business. The appraisal was made, and the plaintiffs did not forfeit the $1,000 agreed on as liquidated damages, but paid the $4,800 fixed by the award, and took a conveyance of the establishment, with the property, subscription list, and good-will appertaining and belonging to it. The property and rights agreed to be sold, and sold distinctly, appear from the written contracts, which operate according to their legal effect; *Furbush* v. *Goodwin*, 25 N. H. 456; and this knowledge was equally open to both parties. *Odlin* v. *Gove*, 41 N. H. 473, 474.

Looking at these contracts we find that the plaintiffs have obtained all that the defendant agreed to sell or did sell to them. We think that the case of *Harrison* v. *Gardner*, on which the plaintiffs seem to rely, is distinguishable from the present. There, by written articles, reciting, among other things, that the plaintiff and defendant had agreed not to renew or continue their copartnership for any further term, "but had not fully agreed which of them should

remain in the occupation of the premises in which the said trade had hitherto been carried on, upon what terms, or for what consideration either, and which of them, the said late copartners should retire from the said concern," it was provided that it should be left to arbitrators to determine, among other things, which of the two " should have the superintendance and administration of the assets and funds" of the firm, and which " should continue and remain in possession of the premises, stock in trade, effects and business, and upon what terms," and " what conveyances, assurances and releases should be executed by either of said copartners to the other." The arbitrators awarded, among other things, that in consideration of £2,000 to be paid by the plaintiff, the defendant should assign over the premises wherein the copartnership trade was carried on, with the good-will of the trade, to the sole use and benefit of the plaintiff. The court upon the evidence found substantially as the plaintiff had alleged in his bill, that the award was made upon the understanding between the parties and the arbitrators, that the defendant should not carry on a trade of the same kind in Fore street, or its vicinity ; and that a part of the sum awarded to the defendant and paid by the plaintiff was on account of this restriction, which, on the faith of this understanding, was omitted to be inserted in the award ; and a decree was made enjoining the defendant from carrying on a trade of the same kind in Fore street or its vicinity. The vice-chancellor, Sir *Thomas Plumer*, says, " the arbitrators were not like arbitrators in general, to decide disputed matters, but to arrange terms, adjust accounts, and determine on subjects upon which they must first consult the parties." From the agreement, as stated in the case, it appears to have been within the power of the arbitrators to have inserted the restriction in the award, and to have made the defendant an allowance on account of it. Upon the finding of the court it must be taken that such an allowance was made and accepted by the defendant with full knowledge of the fact, and that the restriction would have been put into the award but for the understanding and the defendant's promise to be bound by it. In the present case the arbitrators had no such power, and the insertion of a restriction in the award was not prevented by the understanding of the arbitrators and the parties as to it, or by the conduct, request or promise of the defendant ; nor was the restriction omitted in the written contract upon the faith of any such understanding between the parties, or of any such promise by the defendant ; nor has the defendant been shown knowingly to have received payment from the plaintiffs for such an undertaking. Yet these differences involve the points upon which the decision in *Harrison* v. *Gardner* turned. The vice-chancellor says, " the ground on which I decide this case, is upon the good faith and understanding, when this money was awarded to the defendant for the good-will, that he would not carry on the trade in Fore street or its vicinity, which good faith and understanding was the occasion that the award was silent on the subject. It is clear that such an understanding did exist." He also says, " it is said that this is a novel bill, it being to carry an award into execution with an addition by parol evidence. This is not so.

It is a bill for an injunction on the ground of fraud, by receiving £500 for not doing what he afterward does do." It is unnecessary to examine the merits of *Harrison* v. *Gardner*, for this case does not present the essential points upon which that decision passed.

Nor do we think that the intimation in *Shackle* v. *Baker* can aid the plaintiffs here. The report of that case does not set out the bill, but it appears that before answer a motion was made for an injunction, to restrain the defendant from proceeding under a judgment for the consideration of a sale by the defendant to the plaintiff of the good-will of a millinery business. The affidavits stated an agreement for the sale in consideration of £2,000; that the plaintiff proposed that a covenant should be given that the defendant and his wife would not for ten years carry on the same business in Liverpool, &c., and that they would use their best endeavors to assist the plaintiff and procure customers, &c.; that this covenant being objected to by the defendant and his wife, upon the ground that it was an impeachment of their honor and unnecessary, was waived by the plaintiff, upon the mere undertaking of the defendant and his wife. They also stated acts of the defendant and his wife in violation of this undertaking. The chancellor denied the motion, but gave the plaintiff leave to move again upon the coming in of the answer, and said, "considering the covenant which the plaintiff proposed to have, as having been kept out by bad faith, yet if I now enjoin, before answer or any default of appearance, I must give the same effect to the agreement as I should give at the hearing, if the covenant had been contained in it, upon the ground of fraud." Whatever weight may be due to the intimation contained in this case, it is manifestly predicated upon an essentially different state of facts from that existing in the present case, and is not applicable here.

If in this case we adopt the broader construction of the contract, yet the defendant has not continued or held himself out as continuing the business, of which he had sold the good-will to the plaintiffs. The newspaper which he commenced was not and did not purport to be the Dover Gazette, and was not held out as published in continuation of or succession to that journal. It was different in name and fact, and was, as it claimed to be, a new journal. It was called the Dover Sentinel, and differed sufficiently in appearance from the Gazette to avoid liability to mistake. Although both newspapers claim to support the principles of "the democratic party," they in fact advocated quite different views upon several questions of public policy which were then regarded by many as grave and important, and therefore were likely to obtain their chief patronage from different sources, as each would naturally depend mainly upon the supporters of its peculiar views for subscribers. Their advertising business would probably be affected to a considerable extent by these differences; subscribers would generally be likely to prefer for this purpose the journal for which they subscribed, and others would ordinarily be influenced by the character and extent of the circulation. However, patronage in the way of subscription, and to a considerable extent of advertising, of the one was not necessarily

inconsistent with patronage of the other in the same way, and both might receive the subscriptions and publish the advertisements of the same individuals. The mere fact that they were competing would not, in establishments of this kind, prove the identity of their business, but possibly cases might be conceived where the nominal establishment of another business of the kind sold might be in fact but a continuation of the latter. So too the printing office set up by the defendant was not and did not purport to be in continuation of or succession to the Dover Gazette printing office. It was started and carried on by the defendant in connection with the new journal, and was likley to be mainly dependent for its patronage upon that connection. The patronage of newspapers is generally dependent on very many other circumstances than the fact of their being owned, conducted or edited by particular individuals, though there probably are cases where the circulation of a journal is mainly due to the abilities of a particular editor. But we see nothing in the evidence that leads us to think that the Dover Gazette newspaper or printing office had been so particularly dependent on the personal editorship or management of the defendant, that his establishment of the Sentinel, with its connected office, would naturally so call to the latter the old patronage to the exclusion of the former as to render his journal and printing office in fact a continuation of the business included in the bill of sale. The Sentinel and its printing office did not, however, purport to be conducted by the defendant alone, but by "J. T. Gibbs & Co.," and the newspaper was in fact edited by the defendant and another. The business was carried on in the old premises, but they belonged to the defendant, and had been voluntarily abandoned by the plaintiffs for other apartments at some little distance. Considering these circumstances, also the character of the establishment, the size and situation of the town in which they were carried on, and the fact that the defendant in his testimony denies having solicited the patrons of the old establishment to withdraw their support and transfer it to the new, and that he is not shown to have done so; and the further fact that to a very considerable extent customers would not necessarily be withdrawn from the one establishment by their patronage of the other, we are brought to the conclusion that the business established by the defendant in 1860 was not a continuation or an attempt at a continuation of that described in his contract, but was a new and different business, although of a similar kind.

The bill also asks a decree for the delivery of the subscription list of the Dover Gazette to the plaintiffs by the defendant. It appears that the directing books, containing the names and residences of the subscribers to that newspaper, were delivered to the plaintiffs at the time of the sale, and were copied by them; that afterward the plaintiffs permitted the defendant to take these books for use in the settlement of his accounts; and the evidence, we think, shows that the plaintiffs had free access to and full possession of them whenever they chose, but fails to prove any refusal by the defendant to return the books, or any request upon him to deliver them to the plaintiffs. As no improper detention of the books by

the defendant, at the time this suit was brought, is shown, we need not inquire whether his suggestion that the remedy at law would be adequate, if it were otherwise, is well founded.

*The bill must be dismissed.*